**UNITED STATES of America, Plaintiff-Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL NO. 11, Defendant-Appellant.**

**No. 9-2.**

Temporary Emergency Court of Appeals.

Jan. 26, 1973.

Julius Reich, Brundage, Neyhart, Miller, Reich & Pappy, Los Angeles, Cal., for appellant.

Kyle D. Brown, Carl M. Gould, Hill, Farrer & Burrill, Los Angeles, Cal., for appellee NECA.

Harlington Wood, Jr., Washington, D. C., William D. Keller, U. S. Atty., Los Angeles, Cal., Matthew Schumacher, Los Angeles, Cal., William E. Nelson, Washington, D. C., and Paul T. Michael, Alexandria, Va., for appellee United States of America.

Before CARTER, CHRISTENSEN and ESTES, Judges.

JAMES M. CARTER, Judge.

This is an appeal from a judgment granting an injunction against appellant for violating Pay Board Ruling No. 34 by entering into agreements which provided for the deposit in escrow accounts of wages and benefits unapproved (in fact, disapproved) by the Construction Industry Stabilization Committee (hereafter CISC).

The sole question presented by the appeal is whether the District Court correctly held that payment into escrow of the unapproved portion of the wage increase, as demanded by appellant, was a violation of Pay Board Ruling No. 34 and 6 C.F.R. 201.17 (6 C.F.R. 200.41) [1] of the Pay Board regulations. We affirm.

Appellant is the collective bargaining representative for approximately 6,000 electrical workers in and about Los Angeles, California. The National Electrical Contractors Association, Los Angeles County Chapter (hereafter NECA) is the bargaining representative for approximately 200 members of the Association. Approximately 400 other companies, not associated with NECA, have agreed to be bound by the agreement reached between NECA and appellant.

NECA, a defendant below, did not appeal but has filed a brief in support of the position of the United States.

The appellant and NECA entered into an "Inside Wiremen's Agreement" on September 1, 1970 for the period 1970 to 1973. It provided *inter alia* for an increase in wages and benefits totaling $1.71 per hour, to be effective on June 1, 1972.

The Economic Stabilization Act of 1970 (P.L. 91–379, 84 Stat. 799, Aug. 15, 1970) authorized the President to issue such orders and regulations as he deemed appropriate to stabilize wages and salaries at levels not less than those prevailing on May 25, 1970. The President implemented the statute by Executive Order 11588 (36 F.R. 6339, April 3, 1971). In part it provided for the creation of CISC. The CISC was created to assure conformance of all wage and salary increases within the construction industry to the provisions of the order. Section 4(c) of Executive Order 11588 also provided that "[u]nless and until an increase in wage or salary has been approved in accordance with the provisions of sections 3(a) and 4 of this order, it shall be a violation of this order to put such wage or salary increase into effect."

Thereafter, on October 15, 1971, the President issued Executive Order 11627 and, under the authority of the amendments to the Act (Public Law 92–210, 85 Stat. 743, December 22, 1971), issued Executive Order 11640 on January 27, 1972. By virtue of Executive Order 11627, the Pay Board was created, and

---

1. On November 23, 1972, the Pay Board regulations found in Title 6 of the Code of Federal Regulations were recodified with the result that some citations used in the District Court have changed since that time. Citations to the regulations used in the District Court will appear first, with the citations to the new codification, if any, appearing afterwards in parentheses.

continued by Executive Order 11640 to establish criteria and issue regulations for the purpose of stabilizing wages and salaries on a national basis. These later Executive Orders also modified Executive Order 11588 to bring it within the framework of the stabilization program by transferring certain powers formerly vested in the Secretary of Labor to the Chairman of the Pay Board.

Section 1(a) of Executive Order 11640 provides that:

"* * * no person shall, directly or indirectly, pay or agree to pay, in any transaction, wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise."

The Pay Board issued Regulations on March 7, 1972, 6 C.F.R. 201.17 (37 F.R. 4899), providing in part that it was a violation to

"(a) Pay any portion of a wage and salary increase not authorized by such regulations or Pay Board decision;

(b) Receive or accept any portion of a wage and salary increase not authorized by such regulations or Pay Board decision; . . . "

The Regulations in this respect which were revised November 23, 1972, 6 C.F.R. 201.41 (37 F.R. 24960)[2] spell out more precisely the violations.

In performing the duties spelled out in the Executive Orders, the Pay Board issued Pay Board Order No. 2 effective November 14, 1971. (36 F.R. 21857, Nov. 16, 1971)[3] This order authorized the CISC to administer its policies with "respect to wages and salaries and other economic adjustments" within the construction industry. This order further provided that the approval of the CISC was required before any economic adjustments contained in collective bargaining agreements within the construction industry could be implemented.

Pay Board Order No. 2 was amended on April 25, 1972. (37 F.R. 8140, April 25, 1972)[4] The amended order contin-

---

2. 6 C.F.R. 201.41 (37 F.R. 24960, November 23, 1972) of the Pay Board regulations provides in pertinent part:

(a) *In general.* Except as provided in paragraph (b) of this section, it shall be a violation of the provisions of this chapter, subject to the sanctions, fines, penalties, and other relief provided in the Act, for any person to—

(1) *Payment.* Pay, directly or indirectly, immediately or on a deferred basis, any portion of a wage and salary increase not authorized by the provisions of this chapter or by decision or order of the Pay Board or its delegate;

(2) *Receipt.* Receive or accept, directly or indirectly, any portion of a wage and salary increase not authorized by the provisions of this chapter or by decision or order of the Pay Board or its delegate;

(3) *Accessorial acts or attempts.* Induce, solicit, encourage, force, or require, or attempt to induce, solicit, encourage, force or require, any other person to pay or to receive, directly or indirectly, any portion of a wage and salary increase not authorized by the provisions of this chapter or by decision or order of the Pay Board or its delegate;

\* \* \* \* \*

3. Pay Board Order No. 2 (36 F.R. 21857, November 16, 1971) provided in pertinent part:

1. The Pay Board authorizes the Construction Industry Stabilization Committee, effective November 14, 1971, to administer the policies of the Pay Board with respect to wages and salaries and other economic adjustments in the building and construction industry. In other respects, Executive Order No. 11588 of March 29, 1971 remains in effect.

2. All wages and salaries and other economic adjustments contained in collective bargaining agreements, whether scheduled to take effect in the period from August 16 through November 13, 1971, or scheduled to take effect after November 13, 1971 (whether or not previously approved by the Committee), now require the approval of the Construction Industry Stabilization Committee regardless of the number of employees affected.

4. Pay Board Order No. 2, as amended (37 F.R. 8140, April 25, 1972), provides in pertinent part:

1. The Pay Board authorizes the Construction Industry Stabilization

ued the functions of CISC in overseeing and approving all economic adjustments scheduled to be implemented within the construction industry. Furthermore, section 2 of the amended order provided that:

"All wage and salary increases and other economic adjustments contained in collective bargaining agreements in the construction industry scheduled to

take effect on or after August 16, 1971 require approval of CISC regardless of the number of employees involved."

On May 9, 1972, the Pay Board issued Ruling No. 34. (37 F.R. 9350, May 9, 1972)[5] On December 15, 1972, Pay Board Ruling No. 34 was amended and reissued as Pay Board Ruling No. 125. (37 F.R. 26708, December 15, 1972)[6]

Committee (CISC) to administer Pay Board regulations to the extent applicable with respect to collective bargaining agreements in the construction industry. CISC shall also administer CISC "Substantive Policies" as approved by the authorized construction subcommittee of the Pay Board, which are attached as a supplement to this order.

2. All wage and salary increases and other economic adjustments contained in collective bargaining agreements in the construction industry scheduled to take effect on or after August 16, 1971 require approval of CISC regardless of the number of employees involved.

5. Pay Board Ruling No. 34 (37 F.R. 9350, May 9, 1972) provided:

*Facts*: To protect his bid price, a contractor desires to place negotiated wage increases (which represent the last increment in the current wage agreement) in an escrow account pending approval by the Construction Industry Stabilization Committee.

*Issue*: Would it constitute a violation of Economic Stabilization Regulations, 6 CFR 201.17, 37 F.R. 4899 (March 7, 1972), for an employer to place negotiated wage increases in an escrow account pending approval by the Construction Industry Stabilization Committee?

*Ruling*: No. If the wording of the escrow agreement places delivery of the wage increases on the condition of approval by the Construction Industry Stabilization Committee, then until the performance of that condition, the legal title to the wages held in escrow remains in the employer grantor and no title or interest in the wages vests in the employee grantees. Section 201.17, among other things, prohibits the payment or receipt of any portion of a wage and salary increase not permitted by Pay Board regulation or decision. Accordingly, while the wage increases remain in the escrow account pending the condition of approval for delivery, no payment of wages is made by the em-

ployer nor is any portion of the wage increase received by the employees. Note, however, if the wording of the escrow agreement is such that title to the wages will flow to the employees at some future date even though the approval by CISC has not been obtained (e. g. "when controls are lifted * * *"), such wages and salaries would be considered paid in the year put in escrow.

6. Pay Board Ruling No. 125 (37 F.R. 26708, December 15, 1972) provides:

*Facts*. Contractor X must obtain the approval of the Construction Industry Stabilization Committee, a delegate of the Pay Board, for a wage increase provided in a union contract. The contractor must also obtain Pay Board approval for a wage increase for his nonunion employees. To protect his bid price, the contractor desires to place the two separate wage increases in question into an escrow account pending approvals by C.I.S.C. and the Pay Board, respectively. The portions of the wage increases in the union contract which are disapproved by C.I.S.C., if any, and the portions of the nonunion wage increases which are disapproved by the Pay Board, if any, will revert to the employer upon such disapproval.

*Issue*. Would it constitute a violation of Economic Stabilization Regulations, § 201.41, 37 F.R. 24971 (1972), for an employer to place negotiated wage increases in an escrow account pending approval by C.I.S.C. and the Pay Board, respectively?

*Ruling*. No. Section 201.41 prohibits the payment or receipt of any portion of a wage and salary increase not permitted by the Economic Stabilization Regulations or by decision or order of the Pay Board or its delegate. In the situation where wage increases are delivered to and remain in an escrow account pending approval by either C.I.S.C. or the Pay Board, depending on which body has jurisdiction, with reversion to the employer upon disapproval,

Pay Board Ruling No. 125 was made *after* the judgment below, entered October 10, 1972, but brings into focus more clearly the prohibition against escrowing proposed wage increases which have not been approved by CISC.

The proposed increase, to become effective June 1, 1972, of wages and benefits contained in the "Inside Wiremen's Agreement" of September 1970, was submitted to CISC.

On April 26, 1972, CISC decided that $1.00 of the total of $1.71 was approved and could be implemented on June 1, 1972.

On May 5, 1972 appellant sent a letter to all parties covered by the Agreement, contending that, notwithstanding the decision of CISC, the employers were still legally obligated to pay the portion of the wage increase that had not been approved ($.71), and demanding the portion be placed into an escrow account of the employers. On June 1, 1972, appellant asked reconsideration by CISC of its decision of April 26, 1972.

On July 6, 1972, appellant renewed the demand of May 5, 1972, by a second letter to all parties covered by the Agreement. Enclosed were copies of a "Memorandum of Understanding," copies of an escrow agreement, and monthly reporting forms to be completed and returned to appellant upon each deposit into the escrow accounts.

As a result of the demand certain employers entered into escrow agreements and began paying the amounts of the unapproved increase into the escrow accounts.

On July 27, 1972, CISC held a hearing on appellant's request for reconsideration, and on August 2, 1972, CISC reaffirmed its decision of April 26, 1972 and appellant was notified that the continued existence of escrow accounts was a violation of applicable regulations and rulings.

The issue in Pay Board Ruling No. 34 was clearly stated—"Would it constitute a violation [of the Regulations] for an employer to place negotiated wage increases in an escrow account *pending approval* by the [CISC]?" [Emphasis added]. In substance, the ruling held that placing the proposed wage increases in an escrow account would not violate Pay Board Regulations *if* payment of the funds put in escrow would not occur until the approval of CISC had been obtained; but that if CISC has finally acted, then the escrow agreement is unlawful.

### Discussion

▪▪ To state the case is to decide it. The major purpose of the stabilization program was to halt inflation which had infected and was damaging the national economy. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, v. John B. Connally, et al. (D.D.C.1971) 337 F.Supp. 737, 750.

If each party whose request for a wage increase was denied could circumvent the decisions by requiring monies to be paid in escrow, the integrity of the stabilization program would be seriously undermined. An escrow account would insure the creation of a sum of excess funds which, upon payment, could ad-

such increases are neither paid by the employer nor received by the employees. Note, however, if the escrow agreement does [not] provide for reversion to the employer in the event of, and immediately upon denial of the exception by C.I.S.C. or the Pay Board, such wages and salaries would be considered paid and received in the year that such wages and salaries are placed in escrow and

such payment would constitute a violation of the regulations. See examples (4) and (5) of Economic Stabilization Regulations, § 201.41, 37 F.R. 24971 (1972).

(Because of a printer's error, the bracketed word "not" above was excluded from the ruling. The error was corrected in 37 F.R. 27615, December 19, 1972.)

versely affect the inflationary trends as soon as the controls were lifted.

It is beyond dispute that in light of Pay Board Rulings No. 34 and No. 125, the appellant and other parties to the escrow agreements paid and received a portion of the wage increase that had not been approved by CISC. This resulted in the violation of 6 C.F.R. 201.17 (6 C.F.R. 201.41).

Moreover, CISC has interpreted the Ruling to preclude the creation or continuance of escrow accounts after a decision has been rendered. This interpretation was communicated to the parties by a letter dated August 2, 1972.

■ Great deference is to be accorded to the interpretation of regulations and rulings issued by the administrative body. University of Southern California v. Cost of Living Council et al. (Em.App., 1972), 472 F.2d 1065, cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); United States v. Lieb (Em.App., 1972), 462 F.2d 1161.

Appellant's argument that the language in the "Memorandum of Understanding" to the effect that the money will be released from escrow "at such times as they may legally do so" is no justification for its conduct. Appellant's demand on the contractor employers and the placement of wages in the escrow accounts did not occur until after CISC had already failed to approve the $.71 increase and, in fact, had disapproved it. The matter was no longer pending before CISC for approval when the escrows began.

Appellant's contention that the CISC had not finally acted upon the wage increase in question when the escrows began is without merit. Nor is there merit to appellant's speculative contention that the Pay Board or the Congress may in the future authorize payment of the unapproved portion of the wage increase.

The judgment is affirmed.