**750**

UNITED STATES of America,
Plaintiff-Appellee,

v.

The STATE OF CALIFORNIA et al.,
Defendants-Appellants.

and

James Coan and the California State Employees' Association, Intervenors-Appellants.

Nos. 9-13, 9-14.

Temporary Emergency Court of Appeals.

Sept. 19, 1974.

Rehearing Denied Nov. 12, 1974.

Talmadge R. Jones, Deputy Atty. Gen. of Cal., Sacramento, Cal. (Evelle J. Younger, Atty. Gen., and Willard A. Shank, Asst. Atty. Gen., with him on the brief), for defendants-appellants.

Loren E. McMaster, California State Employees' Assn., Sacramento, Cal., for intervenors-appellants.

William C. White, Dept. of Justice, Washington, D. C. (Carla A. Hills, Asst. Atty. Gen., Department of Justice, New York City, with him on the brief), for plaintiff-appellee.

Before CARTER, CHRISTENSEN and ESTES, Judges.

ESTES, Judge.

This is an appeal under Section 211 of the Economic Stabilization Act of 1970, as amended (the Act), by defendants from an order of the United States District Court for the Eastern District of California granting plaintiff, the United States of America, a preliminary injunction forbidding defendant California to pay wage and salary increases which were disallowed by order of the Cost of Living Council (CLC) issued August 29, 1973 during the existence of the Economic Stabilization Program.[1]

On June 30, 1973 the Governor of the State of California signed into law the California State Budget Act of 1973,[2]

---

1. During the times material to the matters in controversy, the largely voluntary wage controls of Phases III and IV, which had been initiated by Executive Order No. 11695 of January 11, 1973, were in effect. The mandatory Phase II general standards as to permissible wage or price increases served thereafter merely as flexible general guidelines. For legislative history describing these phases, see S.Rep. 93-63, in U.S. Code Congressional and Administrative News, 93d Cong., 1st Sess., at 1299-1326.

2. California Statutes 1973, ch. 129.

which was to become effective on July 1, 1973. This legislation provided for pay increases varying from 6.8 to 11.3 percent for various state employees for the period of July 1973 through June 1974. The CLC challenged the amount of the increases and, after receiving submissions from the parties and holding a hearing, on August 29, 1973 issued its decision and order allowing the 6.8 percent increases but limiting the other increases to seven percent. A formal request for review was filed by defendant State of California and denied by the CLC on February 1, 1974. Throughout these proceedings California and its officials have refrained from paying out the disallowed portions of the legislated increases.[3]

On July 12, 1973 defendants-intervenors James Coan and the California State Employees' Association (CSEA) sued California in the California Supreme Court, seeking a writ of mandate which would direct the state officials to pay the entire increases. On April 19, 1974 the California Supreme Court filed its decision directing the state officials to comply with the State Budget Act. Coan v. State of California, 11 Cal.3d 286, 113 Cal.Rptr. 187, 520 P.2d 1003 (1974). That decision became final and effective on May 19, 1974. The Economic Stabilization Program ended on April 30, 1974, except as saved by Section 218 of the Economic Stabilization Act or by the general saving statute, 1 U.S.C. § 109. See *infra*.

On May 8, 1974 the United States filed its complaint in federal court[4] seeking injunctive relief to enjoin California from implementing the State Budget Act in disregard of the August 29, 1973 order of the CLC. After permitting James Coan and CSEA to intervene as parties defendant, the district court on May 17, 1974 issued its order granting the preliminary injunction sought. On June 17, 1974 the defendants filed with this Court separate notices of appeal, which were consolidated for appellate consideration.

Appellants first argue that the Economic Stabilization Act was not intended by Congress to be applied to states, and that even if such intention is found, the Act cannot be applied to the states under the Commerce Clause so as to regulate the exercise of powers reserved to the states under the Tenth Amendment, when such exercise has no rational connection with interstate commerce. Appellants would thus have this Court adopt the reasoning of Coan v. State of California, *supra*, and Fry v. Ferguson, 34 Ohio St.2d 252, 298 N.E.2d 129 (1973). This Court has, however, resolved these issues in favor of Congress' intent and power to regulate wages paid and charges received by

3. By special legislation, funds necessary to implement the act are currently held in trust by the Director of the Department of Finance. California Statutes 1973, ch. 1136.

4. An earlier federal action, in which California sought an injunction against enforcement of the CLC's order and a declaratory judgment that the Act and regulations could not be applied to California, is apparently still pending. California v. United States, C.A. No. S74–17 (E.D.Cal., filed Jan. 11, 1974). In its brief at 6–7, California states that in Civil Action No. S74–17, California is
seeking to restrain enforcement of the Council's Decision and Order by a writ of injunction and to obtain a judgment declaring the Act and regulations unconstitutional as applied to the State of California. See § 211, Economic Stabilization
Act. Among other allegations, the State raised the issues of whether Congress intended the Economic Stabilization Act to apply to the States and, if so, whether Congress had the constitutional authority to impose economic controls over State wages and salaries in light of sovereignty guaranteed to the States under the Tenth Amendment to the United States Constitution.

At oral argument, the Government argued that jurisdiction could be based on the "pending proceeding" in California v. United States, *supra*. Clearly, the "pending proceeding" upon which jurisdiction of this Court is to be founded must be the proceeding before it and not another case, even if based on similar facts. We do not, however, reach the issue raised by counsel as to whether jurisdiction is proper in that case.

states. Murphy v. O'Brien, 485 F.2d 671 (Em.App.1973); United States v. State of Ohio, 487 F.2d 936 (Em.App. 1973), cert. granted sub nom. Fry v. United States, 415 U.S. 912, 94 S.Ct. 1406, 39 L.Ed.2d 466 (1974).

Second, appellants state that the subject matter jurisdiction of the district court and this Court is the principal inquiry on this appeal. This action was filed on May 8, 1974, one week after the expiration of economic controls. Section 218 of the Economic Stabilization Act provides as follows:

> The authority to issue and enforce orders and regulations under this title expires at midnight April 30, 1974, but such expiration shall not affect any action or pending proceedings, civil or criminal, not finally determined on such date, nor any action or proceeding based upon any act committed prior to May 1, 1974.

The August 29, 1973 decision and order of the CLC forbids the state to pay a wage and salary increase in excess of seven percent for the period in question. However, by the explicit terms of Section 218, the CLC and the courts have lost their authority to enforce the order on April 30, 1974, unless one of the two stated exceptions of Section 218 is applicable, or unless such authority is extended by the general saving statute, 1 U.S. C. § 109.

Before discussing in detail the specific arguments of the Government as to how these exceptions might be held to apply, it is helpful to consider the judicial interpretation of "saving clauses" other than Section 218. In Talbot v. Woods, 164 F.2d 493 (Em.App.1947), the Emergency Court of Appeals considered Section 1(b) of the Emergency Price Control Act of 1942, which read in pertinent part as follows:

> The provisions of this Act, and all regulations, orders, price schedules, and requirements thereunder, shall terminate on June 30, 1947 * * *; except that as to offenses committed, or rights or liabilities incurred, prior to such termination date, the provisions of this Act and such regulations, orders, price schedules, and requirements shall be treated as still remaining in force for the purpose of sustaining any proper suit, action, or prosecution with respect to any such right, liability, or offense.

Judge Magruder, writing for a unanimous court, observed that Section 1(b), permitting "suit, action, or prosecution" to be maintained, "obviously refers to civil and criminal *enforcement* proceedings predicated upon past *violations* alleged to have been committed while the Act and regulations thereunder were still in effect . . . ." 164 F.2d at 496 (emphasis added). Since it was undisputed that there was no pending civil or criminal *enforcement* action based on a past violation of an order, a judgment was entered ordering the dismissal of the complaint for lack of jurisdiction. In accord, see Standard Kosher Poultry v. Clark, 163 F.2d 430 (Em.App.1947).

In Stanolind Oil & Gas Co. v. Freehill, 205 F.2d 305 (Em.App.1953), Stanolind and others sought review of an order of the Director of Price Stabilization which fixed the ceiling price of natural gas produced from an oil field in which the plaintiffs held an interest. Subsequent to the filing of the complaint, the Director issued an order exempting sales of natural gas from price ceilings. The Emergency Court of Appeals, interpreting the Defense Production Act of 1950,[5] held that the complaint would be

---

5. The saving clause of the Defense Production Act of 1950, 50 U.S.C. (App.) § 2156(b), provided in pertinent part as follows:

> The termination of the authority granted in any title or section of this Act, or of any rule, regulation, or order issued thereunder, shall not operate to defeat any suit, action, or prosecution, whether theretofore or thereafter commenced, with respect to any right, liability, or offense incurred or committed prior to the termination date of such title or of such rule, regulation, or order.

dismissed because the plaintiffs made "no claim that they have violated any of the provisions of the regulations or orders at issue in suit, or that they are subject to enforcement action therefor; nor that there is any *enforcement* suit pending or contemplated for any such violation." 205 F.2d at 306 (emphasis added).

In Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1953), the United States Supreme Court considered the saving clauses of the Stabilization Act of 1942 and the Defense Production Act of 1950. The Court found the provisions to be without any material difference,[6] and held that the language of the 1950 statute "should receive the same construction now that was placed on similar language in the [Stabilization] Act of 1942." 347 U.S. at 551, 74 S.Ct. at 754. In addition, the Court applied the general saving statute, 1 U.S.C. § 109, which provided in pertinent part as follows:[7]

> The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

The Court decided that the "precise object of the general savings statute is to prevent the expiration of a temporary statute from cutting off appropriate measures *to enforce* the expired statute

in relation to violations of it, or of regulations issued under it, occurring before its expiration." 347 U.S. at 554–555, 74 S.Ct. at 756 (emphasis added).

■■ In response to this consistent line of authority, the Government is able to cite no cases which would permit it to bring this suit after the expiration date of the Act to enjoin California from *now* taking the action it properly refrained from taking during the existence of the Act. Nevertheless, the Government argues that this case can be brought within the exceptions to Section 218. This contention must be considered in light of two important rules of statutory construction: 1) jurisdictional statutes are to be strictly construed. "[I]n construing a definite procedural provision we do well to stick close to the text and not import argumentative qualifications from broad, unexpressed claims of policy." Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071 (1946); 2) exceptions to the general provisions of a statute are also to be strictly construed. See United States v. First City National Bank, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967).

■■ The first exception to the general expiration provision of Section 218 is expressed by the clause: " . . . such expiration shall not affect any action or pending proceedings, civil or criminal, not finally determined on such date . . . ." The Government suggests two ways in which this exception might apply here. First, it is argued that there is a pending civil proceeding, in that California and CSEA

---

6. A similar conclusion was reached by the First Circuit in Bryne v. United States, 218 F.2d 327 at 335 (1st Cir. 1955), in which Judge Magruder, writing for the court, stated:

> It is true that the saving clause in the Defense Production Act is expressed in somewhat different phraseology from the saving clause in the Emergency Price Control Act of 1942. Despite this change in phraseology, the Emergency Court of Appeals has assumed, we think correctly,

that no difference in effect was intended. Haldeman Creamery, Inc. v. Kendall, Em. App.1953, 208 F.2d 360, 363, 364; Lambert's Point Docks, Inc. v. Kendall, Em. App.1954, 215 F.2d 455.

7. The Court applied the general saving statute because it could "find no express, or even implied, provision in the [Defense Production] Act [of 1950] contrary to the policy of the general savings statute." 347 U.S. at 554, 74 S.Ct. at 756.

had submitted themselves to the jurisdiction of the federal district court in Civil Action No. S74–17, which was filed before the expiration of controls.[8] That action was brought by California against the CLC to obtain judicial review of the CLC's August 29, 1973 order. If this Court were to hold that by doing so California submitted itself to a continuing jurisdiction that was not available for enforcement against those employers who did not seek such review, then our decision would be in effect a penalty visited upon California solely because it exercised its statutory right to judicial review of the CLC's order. It seems beyond cavil that California's filing of the judicial review proceedings is not the kind of "pending proceeding" that the Government can use as a justification for bringing this suit. In any event, we would ignore the clear and consistent prior interpretation of "pending proceeding" as meaning "pending enforcement proceeding" were we to justify jurisdiction here on the basis of California's assertion of its right to judicial review. Secondly, the Government asserts that the administrative proceedings through which the CLC prevented the payment of the wage increases during the existence of the Act "can reasonably be considered to be a 'proceeding' not finally determined by May 1, 1974." Appellee's Brief at 15. This argument is clearly without merit. California exhausted its available administrative review procedures on February 1, 1974, and remained in strict compliance with the final CLC order. There are no longer any pending administrative proceedings.

The second exception to the general expiration provision of Section 218 is that "such expiration shall not affect . . . any action or proceeding based upon any act committed prior to May 1, 1974." This provision is clearly designed to allow the initiation of proceedings after the expiration date of the Act, so long as such proceedings are based upon an act committed before expiration. The Government points to four acts which it argues are sufficient to sustain the application of the second exception.[9] None of those acts, however, constituted *violations* of the Act, regulations, or the CLC's order such that they could be the basis for a civil or criminal enforcement proceeding. Indeed, the Government admitted in its complaint that "[a]t all times defendants herein have complied with said Decision and Order and have not paid out any salaries or wages in excess of said Decision and Order." R. at 3. During the period in question, Phase III voluntary controls were in effect. Therefore, only *payment* of wages in violation of a CLC order could constitute an act in violation of the Act.[10]

The first act mentioned by the Government, the passage of the State Budget Act, could obviously never be a violation of the Act or the subject of an enforcement proceeding. The act which, had it occurred, could have been the subject of such proceedings was the implementation of the State Budget Act by paying the wage and salary increases, after they had been successfully challenged, to the state employees. The CLC order prevented this implementation, and it cannot be said that the mere passage of a law by the state government is such an act as is contemplated by Section 218.

8. See note 4, *supra.*

9. The district court found, in paragraph 11 of the Findings of Fact, that the following acts were committed by California:

Within the context of the Economic Stabilization Act of 1970, as amended in 1971 and 1973, the acts committed include, but are not limited to: the enactment of the California Budget Act of 1973; the result-ing challenges by the Cost of Living Council; the Decision and Orders of the Cost of Living Council; defendants' petitions for reconsideration; the filing of lawsuits by defendants in State and Federal Courts; defendants' threats to pay out the disallowed wage and salary increases.

10. See note 1, *supra.*

The second act advanced by the Government is the administrative proceedings through which the CLC prevented the implementation of the State Budget Act. These proceedings were initiated by the CLC, not California, and are not acts of California except to the extent that California filed a request for review, which was its statutory right. Even if they were considered to be acts of California, these proceedings are not acts upon which any action or proceeding for enforcement could be based.

The third act suggested by the Government is the threat made by California to pay out the wage and salary increases. However, there is no indication whatever in the record that any threat was made before the expiration date. In paragraph 2 of the Findings of Fact, filed June 25, 1974, almost two months after the expiration date, the district court stated that defendants *"now* threaten to pay out the disallowed wage and salary increases *on May 20, 1974 or as soon thereafter as possible . . . ."* (emphasis added). The decision in Coan v. California, *supra* was to become final on May 19, 1974, and defendants faced the possibility of being in contempt of the California Supreme Court after that date. The California Supreme Court's decision was effectively restrained by the issuance of the preliminary injunction in this case on May 17, 1974. At any rate, it is the undisputed finding of the district court that the threat made was a threat to pay the amounts on May 20, 1974, and nothing in the record suggests that this threat was made before the expiration date. Moreover, as discussed *infra* (see note 11), any prohibitions against *agreements* to pay were eliminated by Executive Order No. 11695.

The fourth act is the filing of the separate federal court civil action by California. That action was not brought by the Government as a civil or criminal enforcement proceeding. At any rate, as discussed above, the filing of such a judicial review action was California's statutory right, and was not such an act as would now support the bringing of an enforcement proceeding by the Government.

In supplemental memoranda requested by the Court after oral argument, the parties have briefed the question of the applicability *vel non* of United States v. I.B.E.W. Local 11, 475 F.2d 1204 (Em. App.1973), which was not cited by any of the parties. Having duly considered the matter, we are of the opinion that the decision is not relevant here. In *I.B.E.W.* the defendant union entered into wage agreements which provided for increases in excess of those permitted by the Phase II mandatory wage regulations. The agreements were entered into without obtaining the prior affirmative approval of the agency, as required by the regulations. After the agency reviewed the proposed increases and disapproved a portion of them, the defendant union and employers entered into agreements to escrow the disapproved portions and pay them "at such times as they may legally do so." This Court affirmed the issuance of injunctions against such conduct.

Section 218 was not at issue in *I.B.E.W.* The only analogy that can be made between the cases is to argue that to permit California to pass the State Budget Act during controls, and then to delay its implementation until after the expiration of controls, is to allow California to pursue the same type of conduct which was forbidden by the agency and this Court in *I.B.E.W.* This superficial similarity between the cases disappears upon close examination. In *I.B.E.W.* the illegal escrow agreement was entered into *after* the negotiated wage increases had been disapproved; in this case the CLC did not challenge the proposed increases until after the State Budget Act had been enacted and was scheduled to be implemented. In *I.B.E.W.* it was illegal under the Phase II mandatory controls to pay *or to agree to pay*

amounts higher than those specified in the regulations.[11]  In this case, the Phase III guidelines as to permissible wage increases were voluntary and adjustable for certain factors; the only way that the regulations could be violated was to pay an increase which had already been challenged and specifically disapproved by the agency. In *I.B.E.W.* there were official circulars and question-and-answer sheets published by the agency which clearly stated that escrow agreements of the type entered into by I.B.E.W. were illegal; in this case the increases legislated by California were permissible under the provisions of the Phase III regulations until they were later challenged and disapproved by the CLC. In summary, in *I.B.E.W.* the union violated mandatory controls and specific agency orders; in this case California, acting under voluntary controls, has admittedly violated no agency regulation or order.

Since neither of the exceptions to Section 218 is applicable to these circumstances, a judgment will be entered ordering the dismissal of the complaint for lack of jurisdiction.

So ordered.

---

11.  Section 1(a) of Executive Order 11640 (issued on January 27, 1972 under the authority of Public Law 92–210, 85 Stat. 743, December 22, 1971) provided that:

* * * no person shall, directly or indirectly, *pay or agree to pay*, in any transaction, wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise. (Emphasis added.)

Also, 6 C.F.R. § 201.41 (37 F.R. 24960, November 23, 1972) of the Pay Board regulations provided in pertinent part:

(a) *In general.* Except as provided in paragraph (b) of this section, it shall be a violation of the provisions of this chapter, subject to the sanctions, fines, penalties, and other relief provided in the Act, for any person to—

(1) *Payment.* Pay, directly or indirectly, immediately or on a deferred basis, any portion of a wage and salary increase not authorized by the provisions of this chapter or by decision or order of the Pay Board or its delegate;

(2) *Receipt.* Receive or accept, directly or indirectly, any portion of a wage and salary increase not authorized by the provisions of this chapter or by decision or order of the Pay Board or its delegate;

(3) *Accessorial acts or attempts.* Induce, solicit, encourage, force, or require, or attempt to induce, solicit, *encourage, force, or require, any other person to pay or to receive, directly or indirectly,* any portion of a wage and salary increase not authorized by the provisions of this chapter or by decision or order of the Pay Board or its delegate . . . (Emphasis added.)

By Executive Order No. 11695, 38 F.R. 1473 (January 12, 1973), however, the President moved the Stabilization Program into what is commonly known as Phase III. Because economic controls were thereby made voluntary and self-administering, it was no longer a violation of the Act to agree to pay or induce and require to be paid wages in excess of CLC guidelines.